### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | 3:22-CR-130 (SVN) |
| | ) | |
| v. | ) | |
| | ) | |
| RASHAWN SAMMS, | ) | |
| *Defendant*. | ) | January 25, 2023 |

### RULING ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

Sarala V. Nagala, United States District Judge.

On June 4, 2022, the New Haven Police Department ("NHPD") arrested Defendant Rashawn Samms following a traffic stop of his vehicle. Based on evidence seized during the traffic stop, a grand jury subsequently returned a two-count indictment charging Samms with possession with intent to distribute heroin, cocaine, and cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i). Samms now moves to suppress the evidence seized from his vehicle during the traffic stop, arguing that the initiation and duration of the stop, as well as the resulting search of his vehicle, were all constitutionally invalid. For the reasons below, Samms' motion to suppress is DENIED.

### I.       FACTUAL BACKGROUND

The following facts are drawn from the exhibits accompanying the parties' briefing on Samms' motion to suppress and from the body worn camera footage of the officers on the scene.

On June 4, 2022, at approximately 8:00 pm, NHPD Sergeant Christopher Cameron notified plain clothes police officers that he had observed what appeared to be a hand-to-hand drug transaction in the area of Ella T. Grasso Boulevard and Maple Street in New Haven. NHPD Incident Report of Officer Brandon Way, GX1, at 7. Sergeant Cameron observed the operator of

a black Lexus conduct the transaction and then drive north on Ella T. Grasso Boulevard towards Whalley Avenue. *Id.* The Lexus appeared to have tinted windows and a tinted rear marker plate cover. *Id.* NHPD Officers Kyle Listro and Way stopped the Lexus in the area of 239 Fitch Street. *Id.* The remainder of the traffic stop was recorded on the body worn cameras of NHPD officers. The following events are depicted on the camera footage, except where noted.

After stopping the Lexus, Officers Way and Listro approached it. A view of the vehicle's rear license plate holder appears to show a grayish cover over the plate. Officers Way and Listro began speaking with the driver, who was subsequently identified as Samms. Samms initially was looking through a grocery style tote bag in his vehicle when the officers approached. The officers requested Samms' driver's license, registration, and insurance, and Officer Way asked whether the Lexus was Samms' car. Samms acknowledged the Lexus was his car and then reached into the rear passenger side of his vehicle to retrieve a small green shoulder bag. Samms began to rummage through the green bag. Officer Way requested that Samms place the vehicle in park; Samms responded "sure," but did not immediately change gears and continued searching in the green bag. About thirty seconds after they began interacting with Samms, officers noticed a sealed plastic bag containing a green plant-like substance inside the green bag. Officer Listro asked Samms if "you got a little bit of weed in there," and Samms responded affirmatively, that it was "my weed."[1] Samms continued to feel around in his bag. Officer Way again asked Samms to put the car in park; Samms put the green bag down on the passenger seat and then complied. Officer Way continued asking Samms for his license, registration, and insurance, and Samms again began to look through the green bag. Samms reaffirmed to Officer Listro that the Lexus belonged to him. He then removed a small black case from the green bag and told officers it was his "insulin case."

---

[1] Officer Way's incident report represents that Samms stated that the green plant-like substance "was his marijuana for personal use." GX1 at 7.

After setting the insulin case aside, Samms said he was getting his wallet, and began to look through the grocery bag, which was on the passenger seat, and then the green shoulder bag. Officer Way yet again asked for Samms' license, and Samms continued to look through the green shoulder bag.

At this point, about one minute and twenty seconds into the encounter, Officer Way asked Samms to exit his vehicle, and opened the driver's side door. Samms kept his right hand in the green bag and unbuckled his seatbelt with his left hand. Officers Way and Listro proceeded to repeatedly ask Samms to exit the vehicle, and Officer Way asked Samms to leave the two bags in the car. Samms asked why he was being asked to exit the vehicle; Officer Way explained that he did not want Samms to continue reaching inside any bags and Officer Listro stated that the officers wanted Samms out of the car. Although Samms initially appeared to be complying with the officers' instructions, he continued to question why he needed to exit the vehicle. Officer Listro told Samms he was not under arrest. Around this time, Officer Way grabbed Samms' left arm to prevent him from reaching inside the vehicle. Officer Listro also grabbed Samms' left arm. When Samms asked why officers were grabbing him, Officer Way explained that he did not "want [Samms] reaching back in those bags, because I don't know what's in those bags." Samms still did not exit the vehicle.

Then, Samms appeared to be preparing to exit, but he pulled his right arm away from the officers and asked to show the officers something. He said that his sugar was low and that he did not want to faint. The officers responded that they would call an ambulance but needed Samms to exit the car. Officer Listro grabbed both of Samms' hands. Officer Listro then released Samms' hands and grabbed Samms' keys, throwing them away from the vehicle. Samms was then given multiple commands to exit the car, but, according to officers, he locked his legs and refused to exit

the vehicle, despite officers' commands to do so.  GX1 at 7.  Samms reached toward the driver's side door with his right hand and then moved his right hand to the steering wheel.

As Samms was refusing to exit the vehicle, Officer Derek Huelsman entered the vehicle from the passenger side and shut it off.   Another officer, identified as Officer B. Joseph in a report, *id.*, removed Samms' green bag from the vehicle, unzipped it, and began removing items from it. Officer Joseph then left the green bag and the removed items on the hood of the car.  Officer Huelsman was able to shut off the car; as soon as it shut off, however, he saw Samms reach for the push to start button to attempt to turn the vehicle back on.  GX2.  Officer Huelsman grabbed Samms' arm, to attempt to hold it away from the push to start button.  Samms denied that he was trying to start the car.

The officers then attempted to remove Samms from the vehicle, grabbing him by his arms and legs.  Officer Huelsman delivered knee strikes to Samms' right side, and Officer Way struck Samms once in the left leg.  GX1 at 7; GX2.  When these strikes proved unsuccessful in gaining Samms' compliance, Officer Huelsman deployed his taser, which, too, was ineffective.  GX1 at 7; GX2.  Samms protested that he did not "want to die" and was going to faint; he asked officers what he did and repeatedly said his "sugar [was] at 30."  He was eventually pulled from the vehicle face up, dropped to the ground, placed in handcuffs, and taken to the sidewalk.  GX1 at 7; GX2; GX3.  As Samms was being extracted from the vehicle, additional units responded to the scene, and some officers began searching Samms' vehicle.

Sergeant Cameron then searched Samms' green bag and located a Smith & Wesson M+P Shield .40 caliber handgun.  Another officer, identified as Officer R. Hooper, rendered the handgun safe by removing the firearm's loaded magazine and ejecting one live round from the chamber. GX1 at 7.  In Samms' green bag, officers also found a clear plastic bag containing two plastic

sandwich bags that each contained a green plant-like substance and had a total weight of 1.9 ounces. *Id.* Officers searched Samms' vehicle and found two digital scales, a glass jar, and a plastic tray, each of which contained white residue. *Id.* Inside the vehicle's glovebox, Officer Listro located a small black zipper case, different from the one Samms had identified to officers, in which he found one sandwich bag containing a white rock-like substance, a second sandwich bag containing a white powder-like substance, and a third sandwich bag containing forty-nine wax paper folds with a powder-like substance. *Id.* Samples of the substances found in Samms' vehicle tested positive for the presence of cocaine and heroin. *Id.* at 8.

Officers also found $628 in various denominations throughout Samms' vehicle. *Id.* at 7–8. Officer Way represents that the manner in which the substances in Samms' vehicle were packaged, as well as the denominations of the currency found in Samms' vehicle, are consistent with street-level narcotics sales. *Id.* at 8.

Samms was eventually transported to Yale New Haven Hospital by ambulance so that he could be evaluated following Officer Huelsman's taser deployment and because he had expressed concerns about his blood sugar levels. *Id.*

Samms submitted an affidavit in support of his motion to suppress stating as follows. Samms was driving his 2012 Lexus on Fitch Street in New Haven, when he was pulled over by a police vehicle at or near 239 Fitch Street. Samms Aff., ECF No. 29-1, ¶¶ 3, 5. He claims that, at the time, he was "abiding by all known traffic guidelines, rules, and regulations." *Id.* ¶ 4. Two New Haven police officers approached Samms' vehicle, and Samms asked what he had done wrong. *Id.* ¶ 6. The officers asked to see Samms' driver's license but did not alert Samms that he had committed any traffic infractions. *Id.* Over the next minute, several additional police officers arrived at the scene. *Id.* ¶ 7. Eventually, the officers asked Samms to step out of his vehicle,

without informing him that he had committed any traffic infractions.  *Id.* ¶ 8.  At that time, the officers told Samms that he was not under arrest.  *Id.* ¶ 9.  When Samms expressed concerns about his blood sugar levels and refused to exit his vehicle, officers forcibly removed him from it.  *Id.* ¶¶ 10–11.  He characterizes the removal as being "forcibly ripped . . . from [his] vehicle and hurled . . . to the ground, face-first."  *Id.* ¶ 11.  Several officers then began to search the vehicle.  *Id.* ¶ 12.  Samms continued to inquire about the reason that he had been stopped, but officers initially did not answer him.  *Id.* ¶ 13.  Eventually, Samms was told that he had been stopped because his license plate was tinted.  *Id.* ¶ 14.  Approximately ten minutes after he was taken from the car, Samms "heard an officer allege that [Samms had] served someone at a prior time."  *Id.* ¶ 15.  Samms states this was the "first, and only, mention of this supposed conduct."  *Id.*  He also clarified that the officers did not have a warrant or his consent to search the Lexus.  *Id.* ¶ 16.  The affidavit does not mention marijuana.

Samms was ultimately arrested and charged with several offenses, including failure to display a vehicle number plate in violation of Connecticut General Statutes § 14-18c, failure to have a window tinting sticker in violation of Connecticut General Statutes § 14-99g, carrying a pistol without a permit in violation of Connecticut General Statutes § 29-35, and possession of a controlled substance in violation of Connecticut General Statutes § 21a-279(a)(1).  GX1 at 8.  The evidence seized during the traffic stop also resulted in Samms being federally indicted for possession with intent to distribute heroin, cocaine, and cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i).  Samms was not charged, either in state or federal court, with possession of the marijuana.

## II.     NEED FOR EVIDENTIARY HEARING

At the threshold, the Court must decide whether Samms is entitled to an evidentiary hearing in connection with his motion to suppress.  Despite not requesting an evidentiary hearing along with his moving papers, Samms has requested one in his reply briefing.  A court is ordinarily required to hold an evidentiary hearing on a motion to suppress if "the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." *United States v. Watson*, 404 F.3d 163, 167 (2d Cir. 2005); *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992).  A defendant must support his motion with an affidavit from someone who has personal knowledge of the relevant facts; an attorney's statements do not suffice.  *See United States v. Barrios*, 210 F.3d 355, at *1 (2d Cir. 2000) (summary order); *United States v. Gillette*, 383 F.2d 843, 848 (2d Cir. 1967).

Samms' affidavit does not raise contested issues of fact concerning what happened prior to or during the search of his vehicle that would warrant holding an evidentiary hearing.  First, neither Samms' briefing nor his affidavit present contested issues of fact regarding whether his allegedly tinted license plate and windows provided officers with the reasonable suspicion necessary to stop his vehicle.  At oral argument, Samms' counsel asserted that an evidentiary hearing is warranted because Samms has averred that he was "abiding by all known traffic guidelines, rules, and regulations." Samms Aff. ¶ 4.  This general statement, however, falls far short of being sufficiently definite, specific, detailed, and nonconjectural to warrant an evidentiary hearing and, in any event, it suggests at most that Samms was complying with all traffic laws *known to him*.  It does nothing to seriously dispute the Government's contention that Samms' license plate and windows were sufficiently tinted to provide officers with reasonable suspicion that he was committing one or

more traffic violations.  Indeed, the body worn camera footage of the officers appears to confirm that the rear license plate had a tinted cover.

Samms' assertions that body camera footage "reveal[s] only an alleged tinted marker plate violation" and that he "will leave the government to its proof of whether a legitimate traffic infraction occurred and can be proven," ECF No. 29-1 at 13, do not alter the Court's conclusion because "denials made in legal memoranda are not evidence and do not create an issue of fact," *United States v. Holt*, No. 3:21-CR-80 (MPS), 2021 WL 5281366, at *2 (D. Conn. Nov. 12, 2021) (citing *United States v. Mottley*, 130 F. App'x 508, 510 (2d Cir. 2005) (summary order)). Accordingly, Samms' suggestion that his windows were not illegally tinted and his assertion that he will leave the Government to its burden of proof regarding his alleged traffic infractions do not create issues of fact warranting an evidentiary hearing. *See id.* (finding that defendant's statement in motion to suppress that he "put[] the government to its burden of proving that [an officer] in fact observed [him] violating traffic laws justifying his seizure" did not create an issue of fact); *Mottley*, 130 F. App'x at 510 (affirming denial of evidentiary hearing where defendant's affidavit offered only "qualified denial" that, to his knowledge, there was no gun hanging in a specific place in a vehicle).

Likewise, Samms presents no contested issues of fact material to the validity of the length of the traffic stop or the search of his vehicle.  The Government contends that officers were justified in prolonging the stop because Samms failed to initially provide officers with his driver's license, because Sergeant Cameron had witnessed Samms in a suspected hand-to-hand drug transaction, and because officers saw marijuana in Samms' vehicle.  The Government further contends that these occurrences—as well as Samms' refusal to exit his vehicle, his refusal to stop rummaging through his green bag, and his attempts to start his vehicle during the traffic stop—provided

probable cause to search the vehicle. Samms' affidavit does not dispute any of these events at all, much less in a sufficiently definite, specific, detailed, and nonconjectural manner to justify an evidentiary hearing. Instead, Samms focuses on the fact that officers did not immediately tell him why he was being asked to exit the vehicle, but that fact is not material to the validity of the stop or search. Nor does Samms dispute the critical facts that he was observed conducting a hand-to-hand drug transaction immediately preceding the traffic stop or that officers saw a non-*de minimis* amount of marijuana in his vehicle in plain view. His only mention of the drug transaction is that an officer said that he had allegedly "served someone at a prior time," but Samms does not provide any facts contesting this allegation. Further, he does not address the marijuana at all in his affidavit. Accordingly, Samms has presented no contested issues of fact regarding the duration of the traffic stop or the search of his vehicle.[2]

For these reasons, the Court denies Samms' request for an evidentiary hearing on his motion to suppress.

## III.     THE TRAFFIC STOP AND VEHICLE SEARCH

For the reasons described below, the Court finds that the officers had a reasonable basis to believe Samms was committing traffic violations, justifying the stop; that the officers did not unreasonably prolong the stop; and that the automobile exception to the warrant requirement applies, given that officers had probable cause to search Samms' car.

---

[2] Samms attempts to draw support from cases in which defendants were denied evidentiary hearings at least in part because they failed to submit affidavits that created contested issues of material fact, *see* ECF No. 34 at 6–8 (citing, among other cases, *United States v. Ciriaco*, 121 F. App'x 907 (2d Cir. 2005) (summary order)). Samms asserts that, in contrast to the cases he cites, his affidavit was "authored by an individual with personal knowledge of the underlying facts" and provides facts that "are definite, specific, and detailed in that they explain the lack of any legal basis for the motor vehicle detention and subsequent search." *Id.* at 7–8. But, as discussed above, Samms' affidavit does not contest the key facts underlying the Government's assertions regarding the validity of the traffic stop and vehicle search at issue and, as a result, the affidavit is insufficient to warrant an evidentiary hearing.

A. The Initial Stop

The Court begins by finding that officers had a reasonable basis to conclude that Samms was committing one or more traffic infractions and, therefore, they did not violate his Fourth Amendment rights when they stopped his vehicle.

The Fourth Amendment recognizes "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The "ultimate touchstone" of the Fourth Amendment is "reasonableness," which is "a matter generally determined by balancing the particular need to search or seize against the privacy interests invaded by such action." *United States v. Singletary*, 798 F.3d 55, 59 (2d Cir. 2015) (quoting *Riley v. California*, 573 U.S. 373, 381–82 (2014), and *United States v. Bailey*, 743 F.3d 322, 331 (2d Cir. 2014)). Although this balancing "usually demands that searches be conducted pursuant to judicial warrants supported by probable cause," it is well-settled that "neither a warrant nor probable cause . . . is an indispensable component of reasonableness in every circumstance." *Id.* (alteration in original) (quoting, in part, *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 665 (1989)).

"Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a seizure of persons within the meaning of the Fourth Amendment." *United States v. Gomez*, 877 F.3d 76, 86 (2d Cir. 2017) (internal punctuation omitted) (quoting *Whren v. United States*, 517 U.S. 806, 809–10 (1996)). In *Terry v. Ohio*, 392 U.S. 1 (1968), however, the Supreme Court recognized that "police officers may in 'appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.'" *Dancy v. McGinley*, 843 F.3d 93, 106 (2d Cir. 2016) (quoting *Terry*, 392 U.S. at 22).

The Supreme Court has described routine traffic stops as "relatively brief" encounters that are more analogous to *Terry* stops than to formal arrests. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015); *see Arizona v. Johnson*, 555 U.S. 323, 330 (2009) (observing that most traffic stops "resemble, in duration and atmosphere, the kind of brief detention authorized in *Terry*").

In general, to justify a *Terry* stop, an officer must have "reasonable suspicion," defined as "a reasonable basis to think that the person to be detained is committing or has committed a criminal offense." *Dancy*, 843 F.3d at 106 (internal quotation marks omitted) (quoting *Bailey*, 743 F.3d at 332). Reasonable suspicion requires "more than an 'inchoate suspicion or mere hunch,'" *id.* (quoting *United States v. Bayless*, 201 F.3d 116, 133 (2d Cir. 2000)); it "demands specific and articulable facts which, taken together with rational inferences from those facts provide detaining officers with a particularized and objective basis for suspecting legal wrongdoing," *Singletary*, 798 F.3d at 59. The reasonable suspicion standard is not high. *United States v. Weaver*, 9 F.4th 129, 140 (2d Cir. 2021). Rather, it requires "only facts sufficient to give rise to a reasonable suspicion that criminal activity may be afoot." *Dancy*, 843 F.3d at 106 (internal quotation marks omitted).

Reasonable suspicion of a traffic violation "provides a sufficient basis under the Fourth Amendment for law enforcement officers to make a traffic stop." *Stewart*, 551 F.3d at 193; *see Johnson*, 555 U.S. at 327 (holding that, "in a traffic-stop setting, the first *Terry* condition—a lawful investigatory stop—is met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation"). Therefore, to satisfy the Fourth Amendment's reasonableness limitation, an officer making a traffic stop must "have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity." *Gomez*, 877 F.3d at 86 (quoting *Stewart*, 551 F.3d at 193).

The Government contends that officers had a reasonable basis to suspect that Samms was committing a traffic infraction because Samms' license plate and windows appeared to be illegally tinted, in violation of Connecticut law.[3]  After reviewing the parties' briefing and evidence, the Court finds that the officers had reasonable suspicion to effect the traffic stop.  That is, they had "specific and articulable facts which, taken together with rational inferences from those facts" provided officers with a "particularized and objective basis for suspecting legal wrongdoing."  *See Singletary*, 798 F.3d at 59.  First, an NHPD incident report avers that Samms' vehicle had tinted windows and a tinted rear license plate cover.[4]  GX1 at 7.  Second, the body worn camera footage appears to support the Government's assertions that the tinting of Samms' license plate cover, as well as the apparent lack of a sticker on Samms' tinted windows, may have violated Connecticut state law.  Accordingly, officers had a particularized and objective basis to suspect that Samms was committing at least one traffic infraction.

Samms does not dispute that license plates and windows that appear to be unlawfully tinted could provide reasonable suspicion of traffic violations, and does not seriously dispute that his license plate was—or appeared to be—unlawfully tinted.  Instead, he argues that body camera

---

[3] Pursuant to Connecticut General Statutes § 14-18(c), "[n]othing may be affixed to a motor vehicle or to the official number plates displayed on such vehicle that obscures or impairs the visibility of any information on such number plates."  Pursuant to Connecticut General Statutes § 14-99g(e), vehicles with windows that have been "tinted or darkened with any tinted material after factory delivery" must "have affixed to the lower left corner of each such window a sticker legible from outside the vehicle which indicates the sticker registration number, a certification of compliance with the provisions of this section, and such other information as the Commissioner of Motor Vehicles deems appropriate."

[4] The incident reports do not specify whether Sergeant Cameron noticed the tinted windows and tinted rear license plate cover when he observed Samms' participation in the suspected hand-to-hand drug transaction or if, instead, the officers who initiated the traffic stop of Samms' vehicle were the first to notice these potential traffic infractions.  Samms, however, has not raised an issue with respect to who first noticed the suspected traffic infractions, and the Court finds no reason to conclude that the answer to this question would be material to the Court's analysis of whether the traffic stop was properly initiated, based on the collective knowledge doctrine.  *See United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001) (explaining that, under the collective or imputed knowledge doctrine, a search is permissible even if the searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion if sufficient information to justify the search was known by other law enforcement officers involved with the investigation).

footage "reveal[s] *only* an alleged tinted marker plate violation." ECF No. 29-1 at 13 (emphasis added). But, as noted, reasonable suspicion of *any* traffic violation provides a sufficient basis for a traffic stop. *Stewart*, 551 F.3d at 193. Thus, by conceding that body worn camera footage reveals a potential traffic infraction based on his tinted license plate, Samms essentially concedes that officers had reasonable suspicion to conduct a traffic stop, notwithstanding his suggestion that body camera footage does not reveal that his windows were unlawfully tinted.

Samms' assertions in his affidavit and at oral argument that he thought he was complying with all traffic rules, regulations, and guidelines, and that he did not believe his windows and license plate were illegally tinted, do not help him. *See* Samms Aff. ¶ 4. Samms offers no support for the proposition that an individual's subjective belief that he is complying with the law defeats law enforcement officers' reasonable basis for suspecting that he is not. To the contrary, to validly stop a vehicle, officers need only have "reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity," *Gomez*, 877 F.3d at 86; the vehicle operator's subjective belief about whether he is committing a traffic violation is immaterial.

For these reasons, the Court finds that officers had reasonable suspicion to validly initiate the June 4, 2022, traffic stop of Samms' vehicle.[5]

### B.  Duration of the Stop

The Court next rejects Samms' argument that officers unconstitutionally prolonged the traffic stop of his vehicle beyond the time needed to investigate his suspected traffic violations. Contrary to Samms' arguments, officers validly prolonged the traffic stop after they saw what

---

[5] Because the Court finds that officers had a particularized and objective basis to suspect that Samms' windows and license plate cover violated Connecticut state law, the Court need not reach the Government's secondary argument that officers had reasonable suspicion to conduct a *Terry* stop because Sergeant Cameron observed an apparent hand-to-hand drug transaction involving Samms and his vehicle.

appeared to be an unlawful amount of marijuana in Samms' vehicle while Samms was purportedly searching for his driver's license.

The "tolerable duration" of police inquiries during a traffic stop "is determined by the seizure's 'mission,'" which is "to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez*, 575 U.S. at 354.  Because "addressing the infraction" is the purpose of the traffic stop, the stop "may last no longer than is necessary to effectuate that purpose," and authority for the seizure ends "when tasks tied to the traffic infraction are—or reasonably should have been—completed."  *Id.* (internal punctuation omitted).  Aside from determining whether to issue a traffic ticket, an officer's mission in conducting a traffic stop "includes ordinary inquiries incident to the traffic stop," such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."  *Id.* at 355 (internal punctuation omitted).  An officer may also "conduct certain unrelated checks during an otherwise lawful traffic stop," but "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual."  *Id.*  Thus, "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."  *Johnson*, 555 U.S. at 333.

Nonetheless, a traffic stop may be extended "for investigatory purposes if an officer develops a reasonable suspicion of criminal activity supported by specific and articulable facts." *United States v. Foreste*, 780 F.3d 518, 523 (2d Cir. 2015).  Therefore, an officer may be justified in prolonging the detention of a vehicle and its occupants where the officer has "a particularized and objective basis for suspecting legal wrongdoing."  *United States v. Jenkins*, 452 F.3d 207, 214

(2d Cir. 2006).  In determining whether a traffic stop reasonably extended into an investigatory seizure, the Second Circuit considers whether:   "(1) the officer's action was justified at its inception; and (2) the officer diligently pursued a means of investigation that was likely to confirm or dispel his or her suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Santillan*, 902 F.3d 49, 56–57 (2d Cir. 2018).

Here, NHPD officers' observation of what appeared to be an illegal amount of marijuana in Samms' vehicle presented a valid basis for prolonging the traffic stop at issue in this case. Samms does not dispute that, while he was purportedly searching for his driver's license, officers noticed marijuana in his green shoulder bag.  Indeed, the body worn camera footage reflects that one officer asked Samms about the marijuana and Samms confirmed that it belonged to him.  Nor does Samms dispute that the marijuana the officers observed in his vehicle weighed 1.9 ounces, including packaging.  Although Samms could legally possess up to "one and one-half ounces of cannabis plant material" and "five ounces of cannabis plant material in a locked container at [his] residence or a locked glove box or trunk of [his] motor vehicle," Conn. Gen. Stat. § 21a-279a—it was illegal for him to sell or transport with the intent to sell cannabis or cannabis products, *see* Conn. Gen. Stat. § 21a-278b(a) (providing that, subject to certain exceptions, "[n]o person may manufacture, distribute, sell, prescribe, dispense, compound, transport with the intent to sell or dispense, possess with the intent to sell or dispense, offer, give or administer to another person cannabis or cannabis products").

The presence of marijuana in the vehicle, in an amount that appeared to exceed the legal limit for possession of cannabis in the state of Connecticut, provided officers with reasonable suspicion—which was supported by specific and articulable facts regarding the presence and amount of the marijuana—that Samms was engaged in criminal activity.  *See Foreste*, 780 F.3d at

523.  This is especially true given that Sergeant Cameron communicated to other officers that he believed he had witnessed Samms take part in a hand-to-hand drug transaction before the traffic stop.  GX1 at 7.  Accordingly, officers had "a particularized and objective basis for suspecting legal wrongdoing," *see Jenkins*, 452 F.3d at 214, and were justified in prolonging the detention of Samms and his vehicle.  *See, e.g.*, *id.* (holding that the odor of marijuana emanating from a vehicle provides officers with a permissible basis for prolonging a vehicle stop); *Holt*, 2021 WL 5281366, at *3, *5 (finding that, under *Jenkins*, an officer's detection of a marijuana odor during a traffic stop supported reasonable suspicion to continue seizure of the defendant, even though there was a possibility that the odor of marijuana could have come from marijuana that was "legally (or non-criminally) possessed," as such a possibility "does not undermine the reasonableness of [the officer's] belief that it came from criminally possessed marijuana"); *see also United States v. Forbes*, No. 20-CR-6140-FPG-MJP, 2022 WL 6786271, at *25 (W.D.N.Y. June 10, 2022), *report and recommendation adopted*, No. 20-CR-06140-FPG, 2022 WL 4545256 (W.D.N.Y. Sept. 29, 2022) (concluding that "probable cause existed to search the vehicle because when law enforcement approached the [vehicle] they 'smell[ed] marijuana emanating from the car and observ[ed] marijuana in plain view in the car'" (second and third alterations in original)).

Importantly, at the time officers observed the marijuana in Samms' vehicle, they were well within the permissible scope of completing the initial mission of the traffic stop.  As noted, an officer's mission in conducting a traffic stop "includes ordinary inquiries incident to the traffic stop," such as "checking the driver's license."  *Rodriguez*, 575 U.S. at 354.  Here, Samms had not yet provided officers with his driver's license when they noticed the marijuana in his vehicle.  Indeed, Samms claimed to be searching for his driver's license when officers noticed the marijuana.  Accordingly, at the time the officers observed Samms' marijuana, the traffic stop had

extended no longer in duration than was necessary for officers to fulfill the initial mission of the traffic stop and to conduct permissible inquiries incident thereto.

Samms' assertion that officers were not truly concerned about the presence of marijuana in his vehicle is unavailing. Determining whether the reasonable suspicion standard is met involves an "objective inquiry" that "disregards the officer's subjective motivation and asks instead whether a reasonable officer would suspect unlawful activity under the totality of the circumstances." *United States v. Diaz*, 802 F.3d 234, 239 (2d Cir. 2015). While the Court cannot "merely defer to police officers' judgment in assessing reasonable suspicion," it must "view the totality of the circumstances 'through the eyes of a reasonable and cautious police officer on the scene.'" *Bailey*, 743 F.3d at 332 (quoting *Bayless*, 210 F.3d at 133). Here, regardless of whether officers were subjectively motivated by the presence of marijuana in Samms' vehicle when they prolonged the traffic stop, the totality of the circumstances—including Samms' apparent participation in a hand-to-hand drug transaction and the officers' observation of what appeared to be an unlawful amount of marijuana in his vehicle—provided an objective basis for officers to prolong the traffic stop to investigate suspected criminal wrongdoing.

The Court is likewise unpersuaded by Samms' argument that the nature of the officers' search immediately after they removed him from his vehicle shows that the traffic stop was unreasonably prolonged. On this point, Samms takes issue with the officers' immediate search for items unrelated to the initial purpose of the traffic stop. Importantly, however, at the time officers removed Samms from the vehicle and began their search, they had already seen Samms' marijuana. Therefore, they were not restricted to searching only for Samms' license and items related to his alleged traffic infractions. Instead, officers were permitted to extend the stop "for investigatory purposes" in relation to their reasonable suspicion that Samms was engaged in criminal

wrongdoing—namely, the illegal possession, transport, and potential distribution of marijuana. *See Foreste*, 780 F.3d at 523.[6]

For these reasons, the Court finds that officers did not unconstitutionally prolong the duration of the traffic stop of Samms' vehicle.

### C. Automobile Exception

Finally, the Court finds that officers had probable cause to search Samms' vehicle and therefore rejects Samms' argument that the search of his vehicle did not fall within the automobile exception to the Fourth Amendment's warrant requirement.[7]

Searches that are conducted "outside the judicial process, without prior approval by judge or magistrate," are considered "*per se* unreasonable" under the Fourth Amendment, "subject only to a few specifically established and well-delineated exceptions." *United States v. Navas*, 597 F.3d 492, 497 (2d Cir. 2010). One such exception is the "automobile exception," which "permits law enforcement to conduct a warrantless search of a readily mobile vehicle where there is probable cause to believe that the vehicle contains contraband." *Id.* The Supreme Court has justified the automobile exception under two rationales: first, "a person's expectation of privacy in a vehicle is less than his or her expectation of privacy in a home"; and second, "because a vehicle is readily movable, exigent circumstances might require a warrantless search." *United States v. Howard*, 489 F.3d 484, 492 (2d Cir. 2007). The automobile exception applies even if there is "little practical likelihood that the vehicle will be driven away," such as when the driver is being detained by police. *See id.* at 493.

---

[6] Samms has offered no basis for the Court to conclude that the officers' search of his vehicle constituted anything other than a diligently pursued means of investigation that was likely to confirm or dispel officers' suspicions of his potential criminal wrongdoing quickly, during which time it was necessary to detain him. *See Santillan*, 902 F.3d at 56–57.

[7] The Government does not contend that officers had a warrant to search Samms' vehicle, that Samms gave officers consent to search his vehicle, or that the search of Samms' vehicle constituted an inventory search.

Probable cause exists "where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution in the belief that evidence of a crime will be found in the place to be searched." *United States v. Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004) (internal punctuation omitted).  Probable cause is "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011) (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)).  This standard "does not demand certainty," *Gaskin*, 364 F.3d at 457 (citing, in part, *Gates*, 462 U.S. at 238); rather "probable cause to search is demonstrated where the totality of circumstances indicates a fair probability that contraband or evidence of a crime will be found in a particular place," *Clark*, 638 F.3d at 94.  Moreover, "experience and training may allow a law enforcement officer to discern probable cause from facts and circumstances where a layman might not." *Gaskin*, 364 F.3d at 457.

Importantly, "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982).  *See also United States v. Harwood*, 998 F.2d 91, 96 (2d Cir. 1993) ("If the probable cause extends to the entire vehicle, the agent may conduct a warrantless search 'of every part of the vehicle and its contents [including all containers and packages] that may conceal the object of the search.'" (alteration in original) (quoting *Ross*, 456 U.S. at 825)); *Navas*, 597 F.3d at 497 (same).

The Court agrees with the Government that Sergeant Cameron's observation of Samms participating in what appeared to be a hand-to-hand drug transaction, along with officers' observation of marijuana in Samms' vehicle, provided probable cause to search Samms' vehicle.

Accordingly, the Court rejects Samms' argument that the search of his vehicle did not fall within the automobile exception to the warrant requirement.

The Government has presented evidence that Sergeant Cameron observed what he believed to be a hand-to-hand drug transaction involving Samms and his vehicle.  The observation of such a hand-to-hand drug transaction is sufficient to support a finding of probable cause.  *See United States v. Foreman*, 993 F. Supp. 186, 190 (S.D.N.Y. 1998) ("The police had probable cause to stop and arrest Foreman due to their observation of the hand-to-hand transaction and the U-turn and were therefore permitted to search his passenger compartment and any containers therein."); *Smith v. Tobon*, 529 F. App'x 36, 39 (2d Cir. 2013) (summary order) (concluding that district court did not err in finding probable cause to arrest individual based, in part, on observation of individual "engag[ing] in what appeared to [an officer] to be a hand-to-hand exchange of drugs for money in an area where there had been several recent drug arrests"); *United States v. Matos*, No. 17 CR. 182 (KBF), 2017 WL 5989203, at *3 (S.D.N.Y. Dec. 4, 2017) ("Courts in this circuit routinely find probable cause to arrest when an officer believes, based on his or her experience, that an individual is engaged in a hand-to-hand drug sale." (collecting cases)).[8]

Moreover, Samms does not dispute that officers observed marijuana in his vehicle in an amount that turned out to be unlawful.  Under similar circumstances, courts in this Circuit have found that officers had probable cause to search a vehicle pursuant to the automobile exception. *See Forbes*, 2022 WL 6786271, at *25; *see also Andrews v. Dragoi*, No. 3:21-CV-264 (JCH), 2022 WL 2657217, at *4 (D. Conn. July 8, 2022) ("Upon smelling marijuana, it became reasonable for [a police officer] to believe that he would find evidence of a drug offense in the car."); *United States v. Daniels*, No. 21-CR-81 (KAM), 2021 WL 4690837, at *9 (E.D.N.Y. Oct. 7, 2021)

---

[8] Although these cases arise in the arrest context, the "same quantum of evidence" is necessary to establish probable cause in both the search and arrest contexts.  *United States v. Pabon*, 871 F.3d 164, 181 (2d Cir. 2017).

("[U]nder the automobile exception, based on a generalized smell of marijuana, police officers may search the defendant's vehicle and any containers where marijuana may be discovered." (collecting cases)).   As these cases make clear, Sergeant Cameron's observation of Samms' participation in what appeared to be a hand-to-hand drug transaction and officers' later observation of an unlawful amount of marijuana in Samms' vehicle were sufficient to allow an officer of reasonable caution to believe that evidence of a crime—the sale of marijuana—would be found in Samms' vehicle.  *See Gaskin*, 364 F.3d at 456; *see also Maryland v. Dyson*, 527 U.S. 465, 467 (1999) ("If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more.").

Samms contends that officers could not have been certain he was involved in a drug transaction, in part because they did not detain the other person involved in the alleged transaction to confirm or dispel their suspicion that the transaction was illegal.  But officers are permitted to rely on their "experience and training" to "discern probable cause" from the facts and circumstances of the alleged drug transaction, even though a layperson may not have been able to discern such probable cause.  *See Gaskin*, 364 F.3d at 457.  Samms points to no cases holding that the officers were required to stop the other person in order to develop probable cause.  Moreover, the probable cause standard does not demand that officers were *certain* that Samms participated in a drug transaction before searching his vehicle, *see id.*; rather probable cause requires only a "'fair probability' that contraband or evidence of a crime" would be found in the vehicle, *Clark*, 638 F.3d at 94.  The officers' viewing of a non-negligible quantity of marijuana in plain view in the car served to confirm Sergeant Cameron's initial observation of the hand-to-hand drug transaction; taken together, these facts provided the officers with probable cause to search Samms' vehicle.

For these reasons, the Court finds that officers had probable cause to believe that Samms' vehicle contained evidence of a crime.  Accordingly, the officers' search of Samms' vehicle fell within the automobile exception and was therefore constitutionally valid.

## IV.     CONCLUSION

For the reasons described herein, Samms' motion to suppress is DENIED.


**SO ORDERED** at Hartford, Connecticut, this 25th day of January, 2023.


    */s/ Sarala V. Nagala*_____
    SARALA V. NAGALA
    UNITED STATES DISTRICT JUDGE